**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRETT L. CANDELARIA,

      Petitioner-Appellant,

v.

TIM LEMASTER, Warden; and
ATTORNEY GENERAL FOR THE
STATE OF NEW MEXICO,

      Respondents-Appellees.

No. 99-2040

(D.C. No. CIV-97-416-BB)
(D.N.M.)

**ORDER AND JUDGMENT**  *

Before **SEYMOUR,** Chief Judge, **TACHA**, and **BRISCOE,** Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

Asserting that his attorney provided ineffective assistance by coercing him

into a plea agreement, Brett L. Candelaria filed a petition pursuant to 28 U.S.C.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

§ 2254 seeking a writ of habeas corpus.  The district court dismissed Candelaria's petition, concluding that Candelaria's decision to accept the plea was knowing and voluntary.  We previously granted a certificate of appealability and now affirm.

## I.

In 1993, Candelaria was charged in state court with five counts of criminal sexual misconduct.  He was represented by court-appointed counsel, Scott Curtis, from the time the charges were filed until he entered a plea and was sentenced.  Three of the five counts charged Candelaria with criminal sexual penetration of a minor, a first degree felony punishable by a prison term of up to 18 years.  The remaining two counts charged Candelaria with criminal sexual contact with a minor, a third degree felony punishable by a prison term of up to three years.  As a result, Candelaria faced the possibility of a 60-year sentence.  After the preliminary hearing, at which at least one of the alleged victims testified, [1] and after several discussions with his counsel, Candelaria agreed to plead no contest to four counts of criminal sexual contact with a minor.  Candelaria's maximum prison sentence (without enhancement) under the proposed plea agreement was 12 years.

---

[1] According to the government, three victims testified at the preliminary hearing.  See Appellee's Answer Brief at 23.  Neither party to this appeal submitted a copy of the transcript of the preliminary hearing.

On March 30, 1994, New Mexico district judge Ben Eastburn accepted Candelaria's plea. In response to questions posed by Judge Eastburn at the plea hearing, Candelaria indicated that he had discussed the case with his attorney and was aware of the rights he would give up by entering the plea. The judge explained that Candelaria's maximum prison sentence under the agreement was twelve years, with the possibility of four additional years if the court enhanced the sentence. Candelaria confirmed that he signed the plea and that he read and understood the accompanying disposition agreement. He also stated that he had not been promised any benefits beyond those spelled out in the agreement. See Audiocassette Transcript dated 3/30/94 at counter nos. 40-52, 60-75, 87-100, 131-43. After the prosecution described the evidence it intended to present at trial, Candelaria stated that he understood the charges and pleaded no contest. Id. at counter nos. 223-29. Judge Eastburn accepted the plea after concluding that Candelaria's plea was knowing and voluntary, and that there was a factual basis for the plea. Id. at counter nos. 229-35.

On May 3, 1994, Candelaria filed a motion to withdraw his plea. Candelaria argued in the motion that his plea was coerced and based on misinformation supplied by Curtis. On July 15, 1994, New Mexico district judge Paul Onuska held an evidentiary hearing to assess the merits of Candelaria's motion. Three witnesses testified at the hearing: Judge Eastburn, Curtis, and

3

Candelaria. Judge Eastburn testified that he was "very satisfied" that Candelaria understood the plea agreement and agreed to it voluntarily. Transcript Dated 7/15/94, part 1 ("Tr. 1"), at 4-5. The judge indicated that if he had "thought it wasn't voluntary or it wasn't understood or there weren't facts to support it," he "wouldn't have taken the plea." Id. at 6; see also id. (expressing the view that Candelaria's plea was "fully understood, fully voluntary").

Curtis' testimony at the hearing, although somewhat inconsistent, tended to support Candelaria. Curtis stated that he met with Candelaria four or five times to discuss the plea, and described the meetings as follows:

> [Candelaria] was always adamant that he had done nothing wrong and that he had not committed the act with which he was charged. He never wavered from that, from that position[.] [T]o say that I was zealous in advocating that he take this plea is probably an understatement. I was, I think I characterized it in our motion, as extremely overbearing and . . . in retrospect I believe that was accurate. I thought the deal he was being offered under the circumstances and under the facts was an extremely good deal. And . . . I was extremely pushy to get him to take it. Cause I felt it was in his best interest. So . . . our meetings were highly charged. And I was [an] extremely zealous advocate during those meetings.

Id. at 12. Curtis similarly testified that he had "dealt with a lot of criminal defendants over the years" and that he was "as zealous and as overbearing and as pushy with regard to this plea" as he had been with any other defendant. Id. at

4

16. Curtis was concerned that his "aggressive advocacy" and Candelaria's youth[2] left Candelaria "in a position where he probably did something he didn't want to do." Id.; see also Transcript Dated 7/15/94, part 2 ("Tr. 2"), at 6 (communicating Curtis' belief that Candelaria seemed "defeated" and "resigned" when answering Judge Eastburn's questions at the plea hearing).

Curtis also worried that "there may not have been a meeting of the minds" when he and Candelaria discussed various types of pleas. Tr. 1 at 13. Curtis recalled that after he explained guilty, no contest, and Alford[3] pleas, he "made the decision basically without . . . asking [Candelaria] if he approved or disapproved of it and gave him plea paperwork that said no contest without . . . any discussion." Id. at 13, 14; see also id. at 14 (expressing Curtis' view that only a no contest plea would permit Candelaria to "take the position that [he] didn't do anything wrong" while avoiding civil liability). According to Curtis, Candelaria "understood that it was a no contest plea when he entered it," but "probably didn't recognize the distinction between no contest and Alford." Id. at 14. Curtis further recalled that after the plea hearing Candelaria indicated that he thought he had entered an Alford plea. Id. at 13, 16.

---

[2] Candelaria was 22 years old. He could read and write, but did not attend school beyond the tenth grade. Transcript Dated 7/15/94, part 2, at 8-9.

[3] The parties' references to Alford pleas are based on North Carolina v. Alford, 400 U.S. 25 (1970). The Alford decision is discussed infra at 14-15.

That said, Curtis went on to testify that he believed Candelaria's plea may have been voluntary. Curtis emphasized that he

> didn't physically threaten [Candelaria] or twist his arm or put any kind of pressure on him other than to continue to remind him that the facts were difficult against him. That defenses against the charges were difficult. That he was in a bad position. I continually reminded him of the fact that he was in a bad position. . . . [W]hen I talk about the zealous aggressive attitude that I approach[ed] his plea with[,] I wasn't getting into his face and backing him into corners or being physical. I was just extremely zealous in talking [to] him about the difficulties of winning the case at trial and the fact that the trade off was [a] tremendous disadvantage to him if he went to trial and lost. Obviously he's looking at an awful long time in jail [as] opposed to the deal that we made.

Id. at 17; see also id. at 16 (indicating that Curtis never threatened Candelaria).

Curtis stated that the goal was to ensure Candelaria understood that

> his entire position was that these victims, or alleged victims[,] were lying. I continued to advocate the position that it would be impossible in my mind to convince a jury that three victims of this age would conspire to lie and send a man to prison. . . . I'd keep pointing out to him that the strengths of the State's case . . . far outweighed . . . his position that he simply didn't do this.

Tr. 2 at 5. In Curtis' view, Candelaria gave "every appearance of understanding" the difficulties posed by the State's evidence. Id. at 6; see also id. at 3 (stating that Candelaria seemed to understand what his options were).

Candelaria's testimony at the hearing before Judge Onuska was similarly inconsistent, but again suggested that Candelaria felt pressured by Curtis. Candelaria stated that he "want[ed] to go to trial" and that he informed Curtis of

6

his wishes.  Id. at 10.  Candelaria recalled that he and his mother met with Curtis

on the morning of the plea hearing, and described the meeting as follows:

> [Curtis] told me that I was crazy if I didn't take it.  That I should go ahead and take the plea and I told him I didn't want to.  I said I told you . . . I didn't want to and he goes, well you'd say yes and then you say no.  I said, well I say yes because you sit there and hound me till I do. . . .  What I decided was that I didn't want to take it.  [Curtis] just threw the papers on the counter.  Said we've talked about it.  You know we need to decide here what we're going to do here.  He said, I've told you and that's when he proceeded to tell me everything again.  And then my mom and him kinda got into an argument and it just irritated the heck out of me.  So I just threw, I just threatened to sign the papers and said here I'll just sign the f-ing papers and I passed them over to [Curtis].  You know hastily across the table.

Id. at 11. [4]  Candelaria reiterated that he felt "pressured by [his] attorney," did not

agree to the plea of his own free will, and would not have agreed to enter the plea

if Curtis had not strongly urged him to do so.      Id. at 14, 13.  Candelaria also

stated that he believed he was entering an      Alford  plea when he appeared before

Judge Eastburn.    Id. at 15.

Other parts of Candelaria's testimony were more equivocal.  For example,

Candelaria also testified that he signed the plea agreement because he "was just

tired of messing with all of it."      Id. at 12.  Candelaria explained:

---

[4]  Curtis also testified about this meeting.  Curtis believed that Candelaria appeared "undecided about what he wanted to do" on the morning of the plea hearing. Tr. 1 at 13.  During the argument between Curtis and Candelaria's mother, Candelaria "finally threw his hands up in the air" and stated that he "just wanted to get it over with" by entering the plea.      Id.

> Just all of this, I mean I've lost jobs over this, because people call my job and tell them what's going on. And so they find an excuse to let me go. And this has gone on for so long. I lost a lot of friends over it. I've had some friends stick by me and I just figured you know . . . I just kinda in my head just gave up. I just got tired of messing with it. My mom and the attorney are arguing. I don't like to contradict [Curtis] cause he's an elder. So I just signed it.

Id.; accord id. at 14. When asked whether anyone forced him to sign the document, Candelaria responded that "as far as pressure, I would say yes, it was more of a peer pressure." Id. at 13. Candelaria also agreed that Curtis thoroughly explained his options, that he understood what Curtis told him, and that he did not have difficulty understanding the proceedings before Judge Eastburn. Id. at 16-17. A prosecutor concluded his cross-examination of Candelaria with the following question:

> Mr. Devore: Now when Judge Eastburn asked you a litany of questions and one of the questions was, was this plea voluntary? . . . . And you told him that it was. Were you telling the truth that day?

> Mr. Candelaria: I feel that I was. I mean to what I felt voluntary was[,] talking about voluntary today. Maybe I wasn't. The way I felt that day, I guess yeah I did.

Id. at 21.

Judge Onuska denied Candelaria's motion to withdraw his plea, concluding the plea was indeed voluntary. Id. at 24. Candelaria was sentenced to 12 years imprisonment with all but four years of the sentence suspended. See Transcript dated 11/29/94 ("Tr. 3"), at 25. Before he announced Candelaria's sentence,

8

Judge Onuska stated on the record:

> Mr. Candelaria, no matter what I decide here, I want to say a few things first of all. It is clear for me you are extremely articulate, forceful and convincing. And I will not raise it to the level of con-man. But I will say that you know how to turn a phrase very well. And that's to your credit. And the way I believe, and that's why I felt that before and why I still believe . . . [n]obody talked you in[to] admitting your guilt in this thing, allowing a guilty plea to come into this thing. You['re] a lot too forceful and a lot to[o] knowledgeable to have anybody do that to you.

Id. at 24.

After exhausting his state court remedies, in 1997 Candelaria filed a petition for a writ of habeas corpus in federal court. Candelaria asserted in the petition that he was "coerced and intimidated" into accepting the plea, that he did not understand the terms of the plea, and that the plea was a product of Curtis' failure to adequately investigate the charges. Record on Appeal ("ROA"), Doc. 1, at 2. The district court, adopting the recommendations of a magistrate judge, rejected Candelaria's claims and dismissed the petition. See Appellant's Brief-In-Chief, Attach. A-B.

II.

Our review of the denial of a habeas corpus petition is governed by 28 U.S.C. § 2254. When a state court has adjudicated the merits of the petitioner's claim for relief, the writ cannot be granted unless the adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable interpretation of,

9

clearly established Federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). In these circumstances we presume that the factual findings of the state court are correct unless the petitioner can rebut this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Smallwood v. Gibson, 191 F.3d 1257, 1264-65 (10th Cir. 1999). [4] Applying these standards to the case at hand, we conclude that the state courts, in denying relief to Candelaria, did not render any decisions that were contrary to, or involved an unreasonable interpretation of, clearly established Federal law.

Candelaria principally contends that he is entitled to relief because he received ineffective assistance of counsel. To prevail on such a claim, a defendant must satisfy the well-worn requirements of Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show that his counsel's representation "fell below an objective standard of reasonableness." Id. at 688. To do so, the defendant must overcome the "strong presumption" that "counsel's

---

[4] When a state court has not adjudicated the merits of the petitioner's claim for relief, "this court reviews the district court's conclusions of law de novo and factual findings, if any, for clear error." Wallace v. Ward, 191 F.3d 1235, 1241 (10th Cir. 1999). However, if the district court's factual findings are based exclusively on the state court record, "we do not give them the benefit of the clearly erroneous standard but instead conduct an independent review." Smallwood, 191 F.3d at 1264 n.1 (citation omitted).

10

conduct falls within the wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." Id. at 689 (citation and internal quotation marks omitted); see also id. ("Judicial scrutiny of counsel's performance must be highly deferential."). Second, the defendant must show that his counsel's deficient performance prejudiced the defense. Id. at 687, 691-92; see also id. at 694 (stating that a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). When a plea agreement is at issue, to show prejudice the defendant must demonstrate that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

Candelaria cannot establish a necessary predicate for his ineffective assistance of counsel claim – that his plea was, in fact, coerced by his attorney. "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Id. at 56 (citation and internal quotation marks omitted); accord United States v. Carr, 80 F.3d 413, 416 (10th Cir. 1996); Osborn v. Shillinger, 997 F.2d 1324, 1327 (10th Cir. 1993). As a corollary, we will "uphold a state court guilty plea on federal review if the circumstances demonstrate that the defendant understood the nature and the consequences of the

11

charges against him and that the defendant voluntarily chose to plead guilty." Miles v. Dorsey, 61 F.3d 1459, 1466 (10th Cir. 1995) (citing Boykin v. Alabama, 395 U.S. 238, 242-44 (1969)). Whether a defendant involuntarily entered a plea based on ineffective assistance of counsel is "a mixed question of law and fact that we review de novo." Carr, 80 F.3d at 417. To the extent that this question "depends on findings of fact made by the state court on habeas review," however, "these findings, with specified exceptions, carry a presumption of correctness." Cunningham v. Diesslin, 92 F.3d 1054, 1060 (10th Cir. 1996).

The evidence developed in state court demonstrates that Candelaria understood the nature of the charges against him and voluntarily entered a plea. Candelaria testified without contradiction that he understood his "options" (i.e., going to trial or entering a plea of some sort), as well as the strengths of the prosecution's case and the weaknesses of his own case. He also testified that he understood the proceedings before Judge Eastburn. During those proceedings, Candelaria indicated on the record that he understood the factual basis for the charges, the rights he would forfeit by entering a plea, and the possibility that he would receive a prison sentence of up to 16 years. These solemn declarations in open court "carry a strong presumption of verity" and thus "constitute a formidable barrier" to Candelaria's petition for collateral relief. Blackledge v. Allison, 431 U.S. 63, 74 (1977); accord Lasiter v. Thomas, 89 F.3d 699, 702

12

(10th Cir. 1996); Laycock v. New Mexico, 880 F.2d 1184, 1186-87 (10th Cir. 1989). Moreover, two New Mexico trial judges, after observing Candelaria's behavior and listening to his comments in the courtroom, concluded that Candelaria knowingly and voluntarily pleaded no contest. To the extent these conclusions encompass findings of historical fact, they are presumptively correct. See 28 U.S.C. § 2254(e)(1). This uncontroverted or presumptively correct evidence overshadows Candelaria's inconsistent testimony as to whether his plea was voluntary. Compare Tr. 2 at 13, 14 (stating that Candelaria was pressured by Curtis and did not accept the plea of his own free will), with id. at 12-14 (stating that Candelaria accepted the plea because of "peer pressure" and because he was tired of "messing with" the loss of jobs and friends), and id. at 21 (stating that Candelaria felt the plea was voluntary when it was entered).

Curtis' testimony is insufficient to show that Candelaria was coerced into pleading no contest. Curtis' concern that he may have induced Candelaria to "d[o] something he didn't want to do" ignores the fact that a defendant cannot seek refuge in the Sixth Amendment simply because his attorney "vigorously urges" him to accept a plea agreement that appears to be in his best interest. See Miles, 61 F.3d at 1470 (quoting Williams v. Chrans, 945 F.2d 926, 933 (7th Cir. 1991) for the proposition that "even strong urging by counsel does not invalidate a guilty plea") (additional citation and internal quotation marks omitted); see also

13

Carr, 80 F.3d at 417 (rejecting a claim of coercion even though an attorney castigated his client for resisting a plea agreement by calling him "stupid" and "a f***ing idiot"). Similarly, proof of "time pressure, stress, mental anguish, and depression" experienced in plea discussions does not establish that a defendant's plea was involuntary. Miles, 61 F.3d at 1470. Although Curtis believed in retrospect that he might have been "overbearing," his testimony reveals that he did nothing more than zealously encourage Candelaria to accept an agreement that eliminated the possibility of a 60-year prison sentence – a sentence that was not inconceivable given the evidence the prosecution would have presented at trial. Candelaria, not Curtis, was the final arbiter of whether the case would go to trial. Cf. Carr, 80 F.3d at 417 (commenting that even when outside pressures are "palpable" to a defendant, they "do not vitiate the voluntariness of his plea; it [is] still his choice to make").

Candelaria's argument that he acted involuntarily because he believed he was entering an Alford plea is unpersuasive. North Carolina v. Alford, 400 U.S. 25 (1970), holds that "an express admission of guilt" is "not a constitutional requisite to the imposition of criminal penalty." Id. at 37; see also United States v. Maez, 915 F.2d 1466, 1468 (10th Cir. 1990) ("Under Alford, a defendant may enter a plea of guilty to a charged offense, although he does not admit that he committed the charged offense."). The unstated premise of Candelaria's

14

argument is that there was a meaningful difference between an Alford plea and a no contest plea in his case. This is incorrect. Candelaria knew that a no contest plea and an Alford plea were "basically the same thing," see Tr. 2, at 15, entered the former in light of the evidence prosecutors had assembled against him, and did not expressly admit that he committed the charged acts during the plea hearing. The Alford Court itself explained that there is no material difference between "a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when . . . a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." 400 U.S. at 37; see also id. (noting that the denomination of "guilty" rather than "nolo contendere" is insignificant in some circumstances because "the Constitution is concerned with the practical consequences, not the formal categorizations, of state law").

Equally unavailing is Candelaria's argument that Curtis provided ineffective assistance by failing to conduct an adequate investigation. Once more, Strickland provides the relevant legal framework:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate

15

> must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91; accord Miles, 61 F.3d at 1475; Romero v. Tansy, 46 F.3d 1024, 1029 (10th Cir. 1995). In the case at hand, Curtis evaluated the government's evidence and Candelaria's potential defenses using police reports and information gleaned from the preliminary hearing. He also met four or five times with Candelaria to discuss the case. Nothing in the record suggests that Curtis' decision to rely exclusively on this information was unreasonable under the circumstances. This alone is fatal to Candelaria's argument. Cf. United States v. Estrada, 849 F.2d 1304, 1307 (10th Cir. 1988) (finding that an attorney's decision "not to make a more extensive investigation" was reasonable because the limited information possessed by the attorney was "sufficient to determine the necessary breadth of the investigation"). Additionally, Candelaria has not even attempted to identify an important witness or a potential defense that was overlooked by Curtis. This, too, supports the denial of Candelaria's petition. Pre-AEDPA decisions applying a less deferential standard of review demonstrate that an ineffective assistance claim must fail when the petitioner cannot identify the evidence that should have been discovered or how such evidence would have affected the outcome of his case. See Hatch v. Oklahoma, 58 F.3d 1447, 1457 (10th Cir. 1995) (rejecting an ineffective assistance claim because the petitioner did not state "what exculpatory evidence an adequate

16

investigation would have discovered or how this evidence would have affected the outcome" of a particular phase of trial); Moore v. Reynolds, 153 F.3d 1086, 1098 (10th Cir. 1998) (rejecting a similar claim because the petitioner conceded he "lack[ed] factual back-up" to show what might have been discovered if his counsel had conducted a guilt-phase investigation), cert. denied, 119 S. Ct. 1266 (1999).

Candelaria's final argument – that he received ineffective assistance because Curtis failed to advise him of the possibility of an enhanced sentence – fares no better. Curtis acknowledged that he did not discuss with Candelaria the possibility that his sentence could be increased by four years based on aggravating circumstances. Curtis stated that he only discussed a 12-year sentence because he did not believe the prosecution could show that aggravating circumstances required an enhanced penalty. See Tr. 1 at 15-16. It is true that a plea may be involuntary if an attorney "materially misinforms the defendant of the consequences of the plea or the court's probable disposition." Laycock, 880 F.2d at 1186; accord Carr, 80 F.3d at 418. Here, however, Curtis' prediction of a 12-year sentence was accurate. See Tr. 3 at 25 (reflecting that Judge Onuska rejected the prosecution's attempt to increase Candelaria's sentence to 16 years). In any case, "[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of

17

ineffective assistance of counsel." United States v. Gordon , 4 F.3d 1567, 1570 (10th Cir. 1993); accord Lasiter , 89 F.3d at 703. Further, Judge Eastburn informed Candelaria of the possibility of a 16-year sentence before Candelaria agreed to plead no contest. Candelaria's bald assertion that he would have gone to trial if Curtis had mentioned a four-year enhancement prior to the plea hearing is insufficient to sustain an ineffective assistance claim. Cf. Gordon , 4 F.3d at 1571 (holding that a defendant cannot show prejudice by making the "mere allegation" that "but for [his] counsel's failure to inform him about the use of relevant conduct in sentencing, he would have insisted on going to trial").

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge